RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0220p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

LARRY RICHARDSON,

*Plaintiff-Appellee*,

No. 25-1867

*v.*

NATHAN FALK,

*Defendant-Appellant*.

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:23-cv-10488—Susan K. DeClercq, District Judge.

Argued: July 29, 2026

Decided and Filed: August 6, 2026

Before: SUTTON, Chief Judge; McKEAGUE and BUSH, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:** Lars H. Kivari, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Bryan Lammon, FINAL DECISIONS PLLC, Richmond, Virginia, for Appellee. **ON BRIEF:** Lars H. Kivari, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Bryan Lammon, FINAL DECISIONS PLLC, Richmond, Virginia, Samuel Weiss, RIGHTS BEHIND BARS, Washington, D.C., for Appellee.

─────────────

## OPINION

─────────────

McKEAGUE, Circuit Judge. This case asks us to decide whether Nathan Falk (a corrections officer) is entitled to qualified immunity for failing to immediately provide

healthcare to Larry Richardson (an inmate) when Richardson complained of chest pain but showed no external signs of distress.

The evidence in the record shows that Richardson approached Falk to complain of bad chest pains. Richardson also said that he needed to go to the medical wing, and he asked Falk to call for healthcare. Falk dismissed Richardson's concerns and ordered him to return to his cell. Rather than comply, Richardson sat on a nearby wheelchair. Minutes later—and only eight minutes after his initial complaint to Falk—Richardson was taken to the medical wing for treatment. After Richardson spent about an hour waiting for treatment in the medical wing, he had a heart attack. He sued Falk, claiming that Falk's actions—which delayed his trip to the medical wing by eight minutes—violated his Eighth Amendment rights.

Falk filed a motion for summary judgment arguing that he was entitled to qualified immunity. The district court denied Falk's motion. However, caselaw did not put Falk on notice—beyond debate—that failing to immediately respond to solely an oral complaint of chest pain violates the Eighth Amendment. Because Falk did not violate a clearly established constitutional right, he is entitled to qualified immunity, so we **REVERSE** and **REMAND** for entry of judgment in favor of Falk.

## I.  BACKGROUND

### A.  Factual Background

Larry Richardson is an inmate under the Michigan Department of Corrections's custody. He regularly experiences moderate chest pain due to heart issues. On January 27, 2023, while he was incarcerated at the St. Louis Correctional Facility, Richardson started to feel more intense chest pain than normal. He took "a nitro" (medication that increases blood flow to the heart) hoping it would ease his discomfort, but it didn't. Richardson Dep., R.54-4 at PageID 434-35. Around 8:44 PM, Richardson approached Corrections Officer Nathan Falk and complained of "bad chest pains." *Id.* at PageID 439-40. Richardson also told Falk that he "needed to go to healthcare" and "needed [Falk] to call healthcare." *Id.* According to Richardson, even though

Falk had called healthcare on his behalf in the past, *id.* at PageID 433,[1] this time, Falk "was dismissive" of Richardson's complaint and refused to contact healthcare.  *Id.* at PageID 440. Instead, Falk ordered Richardson to go back to his cell.  Rather than comply, Richardson said: "I got sudden death syndrome, I could die at any given minute.  I can drop dead.  I am not going back to the cell and doing that." *Id.*  Allegedly, Falk responded: "Don't drop dead on my base. Go back to your cell." *Id.*  Richardson also claims that Falk threatened to send him "to the hole" if he did not return to his cell.  *Id.*

Once again, Richardson did not comply.  He walked across the room and sat in a wheelchair.  At this point, it was around 8:49 PM.  Richardson sat, undisturbed, for close to three minutes.  Around 8:52 PM, a "wheelchair pusher[]" arrived to take Richardson to the medical wing.  *Id.* at PageID 441-42.  Richardson testified that while he was sitting in the wheelchair, a different prison official—"Sergeant Hammer"—approached him and told him that he would be taken to the medical wing.  *Id.* at PageID 441.  According to Richardson's testimony, Sergeant Hammer is the official who called healthcare on his behalf, although Sergeant Hammer "conveyed his doubts about [Richardson] really having chest pains and a heart attack[,] . . . believ[ing] [Richardson] was faking."  *Id.* at PageID 432.  It is unclear from the record how Sergeant Hammer became aware of Richardson's desire to go to the medical wing.  All told, eight minutes elapsed between Richardson's complaint to Falk and his transportation to the medical wing.

Once he arrived in the medical wing, Richardson waited "for about a[n] hour" without receiving medical care.  *Id.* at PageID 443.  Richardson speculates that he was not treated immediately because he "wasn't hunched over crying and screaming and hollering." *Id.*  When he "couldn't take it anymore," he told a nearby guard that he needed healthcare.  *Id.*  That's when Richardson collapsed to the floor and suffered a heart attack.  Medical staff "started compressions" on Richardson's chest and called an ambulance.  *Id.*  The ambulance personnel

---

[1]Richardson testified that Falk called healthcare on his behalf on December 16 and December 18, 2022. The corresponding medical record for December 16 shows that Richardson completed a COVID screening after an off-site appointment.  There is no corresponding record for the alleged December 18 healthcare call.  Some of Richardson's medical records include handwritten notations (in Richardson's handwriting) stating that Falk took Richardson to offsite medical appointments, but Richardson testified that Falk was not involved in transporting him to the hospital.

used a defibrillator to stabilize Richardson's heart rhythm as they took him to the hospital. Richardson recovered.

## B.  Procedural History

Richardson filed a lawsuit alleging Falk violated his Eighth Amendment right to be free from deliberate indifference to medical needs and his Fourteenth Amendment right to due process.  Falk filed a motion for summary judgment seeking qualified immunity on Richardson's Eighth Amendment claim and dismissal of the Fourteenth Amendment claim (arguing that Richardson's only claim as a prisoner, rather than a pretrial detainee, was the Eighth Amendment claim).  A magistrate judge issued a Report and Recommendation that dismissed Richardson's Fourteenth Amendment claim but denied Falk's assertion of qualified immunity for the Eighth Amendment claim.  To the magistrate judge, a reasonable jury could find that (1) Richardson experienced an objectively serious medical need, (2) Falk was aware that Richardson had a substantial risk of serious harm, and (3) Falk consciously disregarded that risk.

Over Falk's objections, the district court adopted the magistrate judge's Report and Recommendation, concluding that the record contained sufficient evidence from which a reasonable jury could rule in Richardson's favor on both the objective and subject elements of the constitutional violation.  The district court first determined that Richardson survived summary judgment on the objective element because "a reasonable jury could find that Richardson's complaints of bad chest pains demonstrated an obvious need for medical care, and that a layman like Falk would be able to recognize that need."  Op. & Order, R.66 at PageID 558. Then, pointing to evidence showing that Falk ordered Richardson to return to his cell after learning of Richardson's serious medical needs, the district court determined that Richardson survived summary judgment on the subjective element as well.  Addressing qualified immunity's second prong, the district court concluded that that an out-of-circuit case, *Tlamka v. Serrell*, 244 F.3d 628 (8th Cir. 2001), put Falk on notice that his conduct violated a clearly established constitutional right.  This appeal followed.

## II. ANALYSIS

Under the Eighth Amendment, prison officials cannot inflict "cruel and unusual punishments" on persons convicted of crimes. U.S. Const. amend. VIII. "[O]fficials violate this prohibition if they show '"deliberate indifference" to a substantial risk of serious harm' to prisoners." *Pearson v. Mich. Dep't of Corr.*, 170 F.4th 1027, 1037 (6th Cir. 2026) (quoting *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). This extends to medical care; prison officials "can run afoul of the ban on 'cruel and unusual punishments' by failing to give prisoners the medical care that they need to prevent 'pain and suffering' from their health conditions." *Phillips v. Tangilag*, 14 F.4th 524, 532 (6th Cir. 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)).

Falk asserts that he is entitled to qualified immunity on Richardson's Eighth Amendment claim. When an officer invokes qualified immunity, he is entitled to judgment as a matter of law unless the plaintiff can show that (1) the officer violated a constitutional right, and (2) at the time of the events, that right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). The district court held that Richardson cleared those hurdles, denying Falk's qualified-immunity-based motion for summary judgment. We review this type of collateral order de novo. *Salter v. City of Detroit*, 133 F.4th 527, 535 (6th Cir. 2025).

The collateral-order doctrine limits the issues we can review "in a qualified-immunity denial." *Williams v. City of Canton*, 168 F.4th 933, 938 (6th Cir. 2026). In this type of appeal, "[w]e can generally review 'purely legal' questions but cannot resolve quarrels with a plaintiff's record-supported facts." *Cotton v. Hughes*, 176 F.4th 886, 898 (6th Cir. 2026) (quoting *Salter*, 133 F.4th at 534). On appeal, Falk argues that the district court erred at every step (and substep) of the analysis. Some of his challenges are based on legal questions; others are fact-based. But raising both kinds of challenges does not deprive us of jurisdiction over the purely legal questions. *Clark v. Abdallah*, 131 F.4th 432, 445 (6th Cir. 2025) ("When an officer raises both factual and legal challenges, we determine the scope of our jurisdiction by 'separat[ing] an appellant's reviewable challenges from its unreviewable' ones." (alteration in original) (quoting *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020))).

One of Falk's purely legal arguments is that even if we accept Richardson's view of the facts,[2] Falk did not violate a clearly established constitutional right. *See id.* at 445. We start and end by addressing this dispositive argument, which concerns the second prong of the qualified immunity analysis. *Lovell v. County of Kalamazoo*, 172 F.4th 931, 936 (6th Cir. 2026); *see also DeVooght v. City of Warren*, 157 F.4th 893, 898 (6th Cir. 2025).

A right is "clearly established" when, "at the time of the officer's conduct, the law was sufficiently clear [such] that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotations omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741).

We start by defining the right with the proper level of specificity. The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id.* at 63-64 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). For Eighth Amendment claims, the Sixth Circuit often starts by reciting the general proposition that prisoners have a long-recognized right to be free from deliberate indifference to their known medical needs. But language introducing general Eighth Amendment principles should not be construed as the proper specificity with which courts are required to define the contours of a clearly established right. *Finley v. Huss*, 102 F.4th 789, 808-09 (6th Cir. 2024). Richardson makes this mistake by citing cases that reiterate general principles of deliberate indifference jurisprudence and claiming the right should be defined with such generality, as if we should merely ask whether Falk denied care to a heart attack victim.

Defining the right at Richardson's suggested level of generality fails to address the core element of the inquiry: given the officer's *particular circumstances*, is the constitutional

---

[2]Despite relying on his own set of facts for much of his briefing, Falk eventually argues (in his reply brief and at oral argument) that even under Richardson's account of the events, he did not violate a clearly established right. That framing is sufficient to establish our jurisdiction. *See Williams v. City of Canton*, 168 F.4th 933, 939 (6th Cir. 2026) (referencing an officer's concession to the plaintiff's version of the facts in his reply brief and at oral argument).

violation beyond debate? *Wesby*, 583 U.S. at 63-64. That's why Sixth Circuit panels only start by reiterating general Eighth Amendment principles; when it comes time to define the right for purposes of qualified immunity, panels look to the particular circumstances of the officer's interaction with a prisoner (or detainee).[3] *E.g.*, *Burwell v. City of Lansing*, 7 F.4th 456, 477 (6th Cir. 2021) (articulating the long-recognized principle that "a prisoner has a right not to have his known, serious medical needs disregarded," and then analyzing qualified immunity through the lens of the officer's particular circumstances (quoting *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 684 (6th Cir. 2013)).

Here, the particular circumstances include what Falk knew, what Falk saw, the severity and immediacy of Richardson's medical needs, and Falk's response. *See, e.g.*, *Howell v. NaphCare, Inc.*, 67 F.4th 302, 318 (6th Cir. 2023) (evaluating whether an officer who "observed [the detainee's] condition, was tasked with monitoring him, and failed to follow policy in doing so" violated clearly established law); *Burwell*, 7 F.4th at 477 (evaluating whether "declining to render aid to an unconscious detainee lying in a pool of vomit" was a clearly established constitutional violation). A key inquiry is whether the officer observed the prisoner "exhibiting signs of a serious medical condition." *Howell*, 67 F.4th at 318; *see also Grote v. Kenton County*, 85 F.4th 397, 406-07 (emphasizing the importance of "external signs of internal distress" in the deliberate indifference analysis); *Burwell*, 7 F.4th at 474-75 (collecting cases about officers witnessing symptoms of "obvious distress"); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004) (explaining that the detainee had "vomited—a clear manifestation of internal physical disorder"). Another key inquiry is how long the prisoner waited before receiving treatment. *See, e.g.*, *Helphenstine v. Lewis County*, 60 F.4th 305, 327 (6th Cir. 2023) (comparing the wait time of "at least a day" to previous caselaw); *Greene v. Crawford County*, 22 F.4th 593, 615 (6th Cir. 2022) (noting that the defendants did not provide medical assistance "for at least

---

[3]The Eighth Amendment protects a prisoner's right to be free from deliberate indifference, while the Fourteenth Amendment protects a pretrial detainee's right to be free from deliberate indifference. *Lovell*, 172 F.4th at 936. Until 2021, the rights were "analyzed . . . 'under the same rubric.'" *Brawner v. Scott County*, 14 F.4th 585, 591 (6th Cir. 2021) (quoting *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018)). And even after our Court modified the subjective element of deliberate indifference for pretrial detainees in *Brawner*, the objective element of a Fourteenth Amendment claim still matched the objective element of an Eighth Amendment claim. *E.g.*, *Helphenstine v. Lewis County*, 60 F.4th 305, 316-17 (6th Cir. 2023). So looking to Fourteenth Amendment deliberate indifference caselaw can still help inform the Eighth Amendment analysis so long as we do not rely on discussions of the subjective element from post-*Brawner* cases.

two days" while the detainee suffered); *Blackmore*, 390 F.3d at 899 (noting that the detainee "complained orally and in writing for over two days").

According to Richardson's articulation of the facts, Falk knew that (1) Richardson was complaining of bad chest pains, (2) Richardson wanted immediate healthcare treatment, and (3) Richardson thought he could die at any moment. But even when we rely on Richardson's version of the events, there is no evidence Falk observed any external signs or symptoms of a serious medical condition. And even though Falk did not immediately send Richardson to the medical wing, Falk did not prevent Richardson from obtaining healthcare, nor did he force Richardson to go to "the hole" when he refused to return to his cell. In the end, Falk's conduct only delayed Richardson's trip to the medical wing by eight minutes, and nothing in the record indicates how Falk would have reacted if Richardson remained in the wheelchair for hours or began displaying visible symptoms of distress. We define the right through the lens of the record.

Given the requirement to define the right with particularity and tailor the right to Falk's particular circumstances, the question becomes: at the time of the events, was it clearly established that an officer must immediately provide medical assistance to a prisoner who merely complains of symptoms but does not display any external signs of distress? The answer is no.

Richardson bears the burden of showing that Falk is not entitled to qualified immunity. *Johnson v. Russell*, 155 F.4th 759, 766 (6th Cir. 2025). He puts forth two arguments in an attempt to satisfy this burden.

Richardson first argues that this case is obviously within the contours of the Eighth Amendment right to be free from deliberate indifference to medical needs. As noted above, Richardson insists that the right should be defined as if Falk completely denied healthcare to a heart attack victim. Why? Because, according to Richardson, he eventually had a heart attack and there is no evidence showing that Falk sent him to the medical wing. We reiterate that Richardson's proposed characterization of the analysis defines the right at a highly general level that fails to account for Falk's particular circumstances (i.e., what Falk knew, what Falk saw, etc.). Additionally, this was not a complete denial of healthcare—Richardson was taken to the

medical wing shortly after he complained to Falk. Had Falk sent Richardson to "the hole," or otherwise prevented him from going to the medical wing, this would be a different case. But a crucial element of Falk's particular circumstances is the short time period during which Falk did not act. Falk did not treat Richardson for eight minutes; then, a wheelchair pusher took Richardson to the medical wing. At that point, there is nothing else Falk could have done for Richardson's medical needs. We define the right by looking at Falk's failure to act immediately. *See Greene*, 22 F.4th at 615 (framing the right to be free from deliberate indifference to medical needs by looking at how long the prisoner suffered without receiving "*any* medical assistance" (emphasis in original)).

As an alternative to his complete-denial-of-healthcare approach, Richardson next argues that even if we define the right by the eight-minute delay, Falk still violated Richardson's clearly established rights by not immediately providing aid. To get there, Richardson cites *Tlamka v. Serrell*, 244 F.3d 628 (8th Cir. 2001), an out-of-circuit case he considers "directly on point" with Falk's particular circumstances. Appellee Br. 39-40, D.16.

"A clearly established constitutional violation requires on-point, controlling authority or a 'robust consensus of cases of persuasive authority.'" *Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 439 (6th Cir. 2013) (quoting *al-Kidd*, 563 U.S. at 742). *Tlamka*, the out-of-circuit case Richardson primarily relies on (and the only case the district court relied on) for the clearly established prong of the analysis, does nothing to counter Falk's assertion of qualified immunity. *Tlamka* is not controlling authority, and it is far from on point; it does not put Falk on notice that his conduct violated Richardson's rights. *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020). In *Tlamka*, a prisoner "suffered a heart attack and collapsed in the . . . prison yard." 244 F.3d at 630. Fellow inmates with CPR training rushed to the collapsed prisoner's assistance and began providing aid. *Id.* at 630-31. The prisoner responded well to the treatment; he "regained a more normal color, his eyes opened, and his chest began to heave as if he was struggling to catch his breath on his own." *Id.* at 631. When a corrections officer arrived at the scene, he instructed the inmates to stop providing medical care to the fallen prisoner. *Id.* The prisoner's "condition deteriorated immediately"; he "turned blue, and his chest began 'hitching.'" *Id.* As the prisoner continued to "turn[] a darker shade of blue and purple," the officers did not "provide

[the prisoner] with any medical attention." *Id.* The prisoner never regained consciousness. *Id.* In all, the officers delayed the prisoner's treatment for 10 minutes. *Id.* at 635.

While the 10-minute delay in medical treatment from *Tlamka* is similar in length to the delay attributable to Falk, the similarities stop there. Importantly, much like the seminal cases in the Sixth Circuit that address deliberate indifference to medical needs, the officers in *Tlamka* observed visible signs and symptoms of serious health issues—officers saw the prisoner turning blue and still did not provide medical assistance. *Id.* at 631; *see also, e.g.*, *Est. of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005) (explaining that the detainee was complaining loudly for hours, lying on the floor, and "showing the warning signs of a heart attack"); *Blackmore*, 390 F.3d at 899 (emphasizing that the detainee had "vomited—a clear manifestation of internal physical disorder"). Richardson argues that Falk "saw the obvious *signs* of [a] heart attack." Appellee Br. 40, D.16 (emphasis added). But even by Richardson's account, the record only supports one such "sign": his complaint of bad chest pains. There is no evidence in the record that Richardson displayed visible signs of distress (in fact, Richardson acknowledges that other officers thought he was faking his complaints, and he speculates his hour-long wait in the medical wing was likely because he was not showing visible signs of pain or medical need). That is a far cry from *Tlamka*, where the officers watched a prisoner turn blue and lose consciousness, and then still did not take any action.

Richardson's pivot to *Goode v. Berlanga*, 646 F. App'x 427 (6th Cir. 2016), in his briefing does not help his cause. Richardson references *Goode* for the proposition that once an officer knows of a serious medical condition, the officer must immediately request assistance. But in *Goode*, our Court held that neither *Blackmore*, nor other prior cases, established "an obligation to immediately respond to inmates' requests" for medical assistance when the officer is only aware of complaints and had not "observed [the inmate's] injury." *Goode*, 646 F. App'x at 432. Even though *Goode* is unpublished, its reasoning is persuasive. Brief complaints of symptoms, with nothing more, fall short of the obvious displays of medical issues addressed in prior caselaw; the contours of the right to be free from deliberate indifference do not clearly include Falk's alleged shortcomings. *See id.*; *see also Burwell*, 7 F.4th at 474-75 (explaining that

"once an officer *sees* a detainee in obvious medical distress," the officer has an obligation to act (emphasis added)).

At oral argument, Richardson took a different approach, claiming that *Estate of Carter v. City of Detroit* is his best case. But *Carter* doesn't help Richardson either. In *Carter*, as a pretrial detainee was being booked, she told the booking officer "that she was having chest pains and needed to go to the hospital." *Carter*, 408 F.3d at 307. She also requested her "'heart' medication," which she did not have on her person. *Id.* at 313. The booking officer then relayed these complaints to the defendant-officer, who was on duty (and in charge) when the detainee arrived at the precinct. *Id.* at 307-08. In hindsight, it became clear that the detainee's "'heart' medication" was for heartburn, but the Court explained that the officers had no reason to infer the "'heart' medication" lacked a connection to her symptoms. *Id.* at 307-08, 313. While at the precinct, the detainee "cried loudly for help and continued to complain that her chest hurt and that she needed to go to the hospital." *Id.* at 307. She was also observed lying on the floor of the detainment cell. *Id.* at 307, 312. Nonetheless, the defendant-officer eventually "left his shift early without proper relief or permission," and he did so without recording the detainee's complaints or telling fellow officers "that [the detainee] was ill and had requested to be taken to the hospital." *Id.* at 307-08. Importantly, when the defendant-officer left his post early, he knew that the detainee had not gone to the hospital. *Id.* at 308. Later that day, while the defendant-officer was still away from the precinct, the detainee collapsed and died of a heart attack. *Id.*

In this published opinion, our Court determined that the defendant-officer was deliberately indifferent to the detainee's medical needs. Why? Because the defendant-officer ignored the detainee's obvious *signs* of a serious illness that even a layperson could recognize as requiring immediate treatment. As *Carter* explained, the detainee

> displayed the "classic" signs of a serious illness, not a minor malady, but an impending heart attack. She was complaining of chest pain and complaining that she had trouble breathing. She said that she was three days behind in taking her heart medication. She was lying on the floor while [the defendant-officer] was still in the precinct.

*Id.* at 312. So *Carter* clearly established that an officer can be deliberately indifferent when he ignores the "'classic' signs" of a serious illness. *Id.* at 312-13. In *Carter*, that was the

combination of: complaints of multiple heart attack symptoms, a request for prescribed medication, external signs of distress (like lying on the floor), and evidence of long-lasting pain. *Id.* at 312.  And, as *Carter* emphasized, it was the cumulative nature of these signs—taken together—that indicated the detainee had "a serious illness, not a minor malady." *Id.*

It's true that Richardson need not find a case that constitutes a factual twin to demonstrate a clearly established constitutional violation, *see Finley*, 102 F.4th at 809-12, but *Carter* is barely a distant relative compared to the facts that underlie Richardson's claim.  The only overlapping sign of medical need is Richardson's complaint of chest pain.  Looking at the record, there is no evidence Richardson complained of trouble breathing (or shooting arm pain or any other sign of a heart attack); there is no evidence Richardson discussed needing medication; there is no evidence Richardson was lying on the floor or otherwise showing external signs of distress; and there is no evidence Richardson was complaining loudly for hours.  Richardson's oral complaint of chest pain, without any other sign of distress, does not stack up to the cumulative signs of a serious illness that the defendant-officer ignored in *Carter*.

We look to caselaw for the contours of the clearly established right.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  And we cannot say—beyond debate—that a reasonable officer would read *Tlamka*, *Goode*, *Carter*, or any other precedent and understand that Falk's conduct violates the Eighth Amendment.  *See id.*  Richardson does not cite any case in which a court held that an officer was deliberately indifferent to a prisoner's medical needs by failing to respond immediately when the prisoner had no external signs of a serious health issue.  And, given the nature of corrections officers' interactions with prisoners, without caselaw indicating otherwise, Falk was not on notice that as soon as a prisoner (with no visible signs of distress) complained of bad chest pain, he would need to provide immediate medical assistance.  *See Finley*, 102 F.4th at 809.  Because Falk did not violate a clearly established constitutional right, he is entitled to qualified immunity.

## III. CONCLUSION

For these reasons, we **REVERSE** the district court's denial of Falk's motion for summary judgment and **REMAND** for entry of judgment in favor of Falk.